**WESTERN RIM INVESTMENT ADVISORS, INC., et al.,**

v.

**GULF INSURANCE CO.**

No. 4:02–CV–112–Y.

United States District Court, N.D. Texas, Fort Worth Division.

June 17, 2003.

---

Robert L. Chaiken, Chaiken & Chaiken, Dallas, TX, for Plaintiffs.

Rick J.W. Graham, Graham, Bright & Smith, Dallas, TX, pro se.

Sidney H. Davis, Jr., Touchstone, Bernays, Johnston, Beall & Smith, Dallas, TX, for Gulf Ins. Co.

*ORDER DENYING DEFENDANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFFS' PARTIAL MOTION FOR SUMMARY JUDGMENT*

MEANS, District Judge.

Pending before the Court are the parties' cross-motions for partial summary judgment, both filed on October 16, 2002. Having carefully considered the motions, responses, and replies, the Court concludes that the defendant's motion should be DENIED and the plaintiffs' motion should be GRANTED.

## I. RELEVANT BACKGROUND

In July 2001, the plaintiffs [1] (collectively referred to as "the Western Rim entities") were sued in the 44th Judicial District Court, Dallas County, Texas, by Monarch Service Company and others ("the Monarch lawsuit").[2] The plaintiffs in the Monarch lawsuit ("the Monarch plaintiffs") allege that the Western Rim entities, through their agent, American Blast Fax, sent 80,000 unsolicited facsimiles advertising apartment complexes to prospective tenants.[3] The Monarch plaintiffs allege that, by sending these faxes, the Western Rim entities have "violate[d] [their] right to privacy," "force[d] them to incur an expense which they did not request," and "deprive[d] [them] of the full use of their property." (Monarch Pls.' Third Am. Pet. at 6–7.) The Monarch plaintiffs claim that the facsimile advertising conducted by the Western Rim entities, through American Blast Fax, is in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*,[4] which provides a private cause of action for a party who receives unsolicited facsimile advertisements. The Monarch plaintiffs seek recov-

---

1. The plaintiffs in this suit are: (1) Western Rim Investment Advisors, Inc.; (2) Western Rim Property Services; (3) Western Rim Investment Advisors 97–1 Inc.; (4) Western Rim Investment Advisors 00–2 LLC; (5) Western Rim Limpar Genpar 00–2 LLC; (6) Western Rim Investment Advisors 00–3 LLC; (7) Western Rim Limpar Genpar 00–3 LLC; (8) Western Rim Investment Advisors 01–1 LLC; and (9) Western Rim Limpar Genpar 01–1 LLC.

2. This suit is styled *Monarch Service Company, et al. v. Western Rim Property Services, Inc., et al.* and is currently pending.

3. This conduct is alleged to have occurred between November 1999 and October 2000.

4. The relevant portion of the TCPA states:

It shall be unlawful for any person within the United States—
(C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine . . . .

47 U.S.C. § 227(b)(1) (2003). According to the TCPA, "a suit may be brought for TCPA violations in state court only if permitted by state law or state court rule." *See Autoflex Leasing, Inc. v. Manufacturers Auto Leasing, Inc.*, 16 S.W.3d 815, 817 (Tex.App.—Fort Worth 2000). Section 35.47(f) of the Texas Business and Commerce Code is the enabling provision in Texas that provides for a private right of action under the TCPA. *See* TEX. BUS. & COM. CODE ANN. § 35.47 (Vernon 2002); *Autoflex Leasing, Inc.*, 16 S.W.3d at 817.

ery of both statutory damages under the TCPA and actual damages for negligence per se.

The Western Rim entities were covered by a commercial general-liability insurance policy ("CGL policy") issued by defendant Gulf Insurance Company ("Gulf").[5] On December 10, 2001, the Western Rim entities sent a copy of the petition in the Monarch lawsuit to Gulf and requested that Gulf defend them pursuant to coverage provided by the CGL policy. Subsequently, on January 24, 2002, Gulf sent a letter to the Western Rim entities denying the existence of coverage and refusing to undertake the duty to defend. After several weeks of exchanging correspondence, the Western Rim entities, on February 7, filed suit against Gulf in this Court for: (1) a declaratory judgment that, in essence, Gulf had a duty to defend the Western Rim entities in the Monarch lawsuit; (2) breach of contract; (3) breach of the duty of good faith and fair dealing; (4) violation of article 21.55 of the Texas Insurance Code ("the TIC"); (5) violation of article 21.21 of the TIC; and (6) negligence.

The Western Rim entities claim that Gulf owes a duty to defend them against the Monarch lawsuit because two sections of the CGL policy provide them with coverage: (1) property-damage section and (2) advertising-injury section. In addition, the Western Rim entities claim that because Gulf has breached its contract by refusing to defend them, Gulf is liable for the statutory penalties under article 21.55 of the TIC.[6] Gulf, on the other hand, argues that it does not have a duty to defend the Western Rim entities because either none of the allegations in the petition in

the underlying Monarch lawsuit trigger the coverage under the CGL policy or the allegations are excluded from coverage.

The section in the CGL policy providing coverage for property damage states:

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of ... "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages....

. . . .

b. This insurance applies to ... "property damage" only if:

(1) The ... "property damage" is caused by an "occurrence" that takes place in the "coverage territory" ....

(Pls.' App. to Mot. for Summ. J. ("Pls.' App.") at 48.) The policy defines "occurrence" as "an accident,[6] including continuous or repeated exposure to substantially the same general harmful conditions." (Pls.' App. at 57.) Furthermore, the policy defines "property damage" as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Pls.' App. at 58.)

The section in the CGL policy providing coverage for advertising injury states:

---

5. The Western Rim entities were covered by Gulf's CGL policy no. GU0446294 from February 1, 1999, to February 1, 2000, and by Gulf's CGL policy no. GU0498096 from February 1, 2000, to February 1, 2001.

6. The Court will not address this claim because the Court, on April 24, 2003, issued an order granting the parties' joint motion to dismiss it.

6. The term accident is not defined in the CGL policy.

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of ... "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages....

....

b. This insurance applies to

....

(2) "Advertising injury" caused by an offense committed in the course of advertising your goods, products or services ....

(Pls.' App. at 51.) "Advertising injury" is defined as an injury arising out of one or more of the following offenses:

a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

b. Oral or written publication of material that violates a person's right of privacy;

c. Misappropriation of advertising ideas or style of doing business; or

d. Infringement of copyright, title or slogan.

(Pls.' App. at 56.) The CGL policy does not define the phrase "right of privacy" and excludes coverage for an advertising injury that "aris[es] out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity" or that "aris[es] out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." (Pls.' App. at 51.)

## II. APPLICABLE LAW

### A. Summary–Judgment Standard

Summary judgment is proper when the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir.1945)). Facts are considered "material" if they "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagara Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir.1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.; Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir.1989).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir.1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.1992). Thus, parties should "identify specific evidence in the record, and ... articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir.1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

To prevail on a motion for summary judgment, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A defendant moving for summary judgment may submit evidence that negates a material element of the plaintiff's claim or show that there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Crescent Towing and Salvage Co. v. M/V Anax,* 40 F.3d 741, 744 (5th Cir.1994); *Lavespere,* 910 F.2d at 178.

To negate a material element of the plaintiff's claim, the defendant must negate an element that would affect the outcome of the action. *See Anderson,* 477 U.S. at 247, 106 S.Ct. 2505. If the defendant moves for summary judgment alleging no evidence to support an essential element of the plaintiff's claim, the defendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the defendant need only show that the plaintiff, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. 2548; *Teply v. Mobil Oil Corp.,* 859 F.2d 375, 379 (5th Cir.1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

**B. Duty to Defend**

In a diversity action, the Court is to apply the substantive law of Texas. *See Sentry Ins. v. R.J. Weber Co., Inc.,* 2 F.3d 554, 556 (5th Cir.1993). The issue in this case is whether Gulf's CGL policy requires Gulf to defend the Western Rim entities in the Monarch lawsuit. To decide that issue, the Court must construe and apply the CGL policy. "Construction and application of insurance policy provisions is a question of law appropriate for summary disposition." *Prime TV, LLC v. Travelers Ins. Co.,* 223 F.Supp.2d 744, 749 (M.D.N.C. 2002) (citing *Harleysville Mut. Ins. Co. v. Packer,* 60 F.3d 1116, 1121 (4th Cir.1995)).

"[A]n insurer may have a duty to defend the insured, but may not ultimately have a duty to indemnify the insured." *Mt. Hawley Ins. Co. v. Steve Roberts Custom Builders, Inc.,* 215 F.Supp.2d 783, 787 (E.D.Tex.2002) (citing *Farmers Tex. Cty. Mut. Ins. Co. v. Griffin,* 955 S.W.2d 81, 82 (Tex.1997)). An insurer's duty to defend its insured is generally broader than the duty to indemnify. *See St. Paul Fire & Marine Ins. Co. v. Green Tree Financial Corp.-Texas,* 249 F.3d 389, 391 (5th Cir. 2001); *Hardy v. Hartford Ins. Co.,* 236 F.3d 287, 290 (5th Cir.2001). If any portion of a suit is potentially covered under an insurance policy, then the insurer must defend the insured in the entire suit. *See St. Paul Fire & Marine Ins. Co.,* 249 F.3d at 391; *Mt. Hawley Ins. Co.,* 215 F.Supp.2d at 787.

"Texas courts apply the 'eight corners' or 'complaint allegation' rule to determine whether an insurer has a duty to defend." *St. Paul Fire & Marine Ins. Co.,* 249 F.3d at 391 (citing *Potomac Ins. Co. of Illinois v. Jayhawk Med. Acceptance*

*Corp.*, 198 F.3d 548, 551 (5th Cir.2000)). "In applying the 'eight corners rule' the insurer's duty to defend is determined solely by the allegations in the most recent petition and the insurance policy." *Mt. Hawley Ins. Co.*, 215 F.Supp.2d at 787. "The initial burden is on the insured to demonstrate that the claim against it is potentially within the scope of the insurance policy's coverage." *Id.* If the insurer denies coverage based on an exclusion in the policy, then the burden shifts to the insurer to prove that one of the policy's exclusions is applicable to deny coverage. *See Harken Exploration Co. v. Sphere Drake Ins. P.L.C.*, 261 F.3d 466, 471 (5th Cir.2001). "If the insurer is successful, the burden shifts back to the insured to show that an exception to the exclusion brings the claim against [him] potentially within the scope of coverage under the insurance policy." *Id.*

■ The court must determine whether the alleged misconduct of the insured invokes coverage by first looking to the plaintiff's pleadings in the underlying suit.[7] *St. Paul Fire & Marine Ins. Co.*, 249 F.3d at 391. "The focus of this inquiry is on the facts alleged, not on the actual legal theories." *Id.* (citing *Maayeh v. Trinity Lloyds Ins. Co.*, 850 S.W.2d 193, 195 (Tex.App.—Dallas 1992, no writ)). "The duty to defend arises if the factual allegations in a third party's pleading *potentially* state a cause of action covered under the insurance policy." *Id.* The court's decision regarding the duty to defend is *not* to be influenced by "facts ascertained before the suit, developed in the process of litigation, or by the ultimate outcome of the suit." *Potomac Ins. Co. of*

*Ill.*, 198 F.3d at 551. "Where the complaint does not state facts sufficient to clearly bring the case within or without coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy." *St. Paul Fire & Marine Ins. Co.*, 249 F.3d at 392. In determining whether the claim falls within the scope of the insurer's duty to defend, the Court is to liberally construe the allegations in the petition. *See id.*

■ Once the court assesses the potential causes of action in the pleadings, the court has to determine whether the alleged conduct is covered by the policy. *St. Paul Fire & Marine Ins. Co.*, 249 F.3d at 392. "If the terms of the policy are not ambiguous, then the words must be given their plain meaning." *Id.* The determination whether a contract term is ambiguous is a matter of law. *D.E.W., Inc. v. Local 93, Laborers' Int'l Union*, 957 F.2d 196, 199 (5th Cir.1992). "Language in insurance provisions is only ambiguous if the court is uncertain as to which of two or more meanings was intended." *St. Paul Fire & Marine Ins. Co.*, 249 F.3d at 392. "If multiple interpretations are reasonable, the court must construe the contract against the insurer." *Id.*

## III. ANALYSIS

The Western Rim entities contend that Gulf owes them a duty to defend because the claims in the Monarch lawsuit fall within the property-damage and advertising-injury coverages provided by Gulf's CGL policy. Applying the eight-corners rule, to prevail on their contentions the Western Rim entities must establish the

---

7. "[A]n insurer's contractual duty to defend must be determined solely from the face of the pleadings, without reference to any facts outside the pleadings. The duty to defend arises when a third party sues the insured on allegations that, if taken as true, potentially

state a cause of action within the terms of the policy." *Houston Petroleum Co. v. Highlands Ins. Co.*, 830 S.W.2d 153, 155 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (citations omitted).

possibility that the injury alleged in the Monarch petition [8] is either a property-damage or an advertising injury as defined in the CGL policy. The Monarch plaintiffs make the following pertinent allegations in their petition:

1. The Western Rim entities are "businesses that have used telephone facsimile machines ... to send unsolicited advertisements ... or have had others utilize these devices on [their] behalf and with their knowledge."

2. The Western Rim entities "faxed, or had faxed on [their] behalf, with [their] knowledge, unsolicited advertisements to Plaintiffs and others.... The [plaintiffs] received one or more Western property faxes and have never provided their prior express invitation or permission to anyone to send them these or any other fax ads."

3. "Whenever an unsolicited facsimile is sent, the TCPA gives a right of action for damages, injunctive relief, or both. 47 U.S.C. § 227(b)(3). In this case the Class Representatives seek both. The measure of damages is the actual damages sustained or $500 for each violation .... The Class Representative ... elects ... to recover the $500 liquidated award .... 47 U.S.C. § 227(c)(5)."

4. "The sending of unauthorized facsimiles in violation of this statute ... violates the Plaintiffs' right to privacy. Moreover, it unilaterally forces them to incur an expense which they did not request, including ... the loss of business opportunity and valuable time and productivity .... Next, this illegal activity deprives the Plaintiffs of the full use of their property."

5. "The conduct of the defendants singularly and in ... concert ... with oth-ers ... amounts to the following violations of law[:] violations of 47 U.S.C. [§ ] 227, *et seq.* and the regulations promulgated pursuant thereto and ... Section 35.47 of the Texas Business and Commerce Code, invasion of privacy and trespass."

6. "Upon information and belief, many of the defendant's violations of the [TCPA] were not committed negligently, but alternatively, were committed willfully and/or knowingly. Consequently, the award should be increased to three times the amount of damages as authorized by this statute or alternatively, Plaintiffs are entitled to punitive damages for the intentional and malicious acts of the defendant."

7. "All Plaintiffs hereby opt under the TCPA to recover $500 as opposed to their actual damages."

## A. Property Damage

▮ The first issue is whether the allegations in the Monarch lawsuit constitute property damage as defined in Gulf's CGL policy. According to the policy, Gulf has a duty to defend the Western Rim entities if the Monarch plaintiffs alleged that they sustained property damage as a result of an occurrence. The CGL policy defines an occurrence as "an accident,[9] including continuous or repeated exposure to substantially the same general harmful conditions." (Pls.' App. at 57.) In *Mid–Century Insurance Co. of Texas v. Lindsey*, 997 S.W.2d 153, 155 (Tex.1999), the Texas Supreme Court held that two elements must be considered in determining whether an event is an accident: (1) the intent underlying the actor's actions and (2) whether the injury is a reasonably fore-

---

8. The Court will focus on the last-filed petition in the Monarch lawsuit, which is the Monarch plaintiffs' third-amended class-action petition filed on September 30, 2002.

9. The term accident is not defined in the CGL policy.

seeable or intended consequence of the actor's actions. In construing Texas Supreme Court precedent on whether an event is an accident, the United States Court of Appeals for the Fifth Circuit has provided some guidance:

The Texas Supreme Court has told us that there is not an accident when the action is intentionally taken and performed in such a manner that it is an intentional tort, regardless of whether the effect was unintended or unexpected. *See Argonaut Southwest Ins. Co. v. Maupin,* 500 S.W.2d 633, 635 (Tex.1973) (finding that there was not an "accident" when the action was a trespass, the removal of soil from the wrong piece of real property, and the effect was the unintended and unexpected resulting hole in the wrong piece of real property); *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.,* 197 F.3d 720, 723–24 (5th Cir.1999) (discussing *Maupin* ). We also know, however, that there is an accident when the action is intentionally taken, but is performed negligently, and the effect is not what would have been intended or expected had the action been performed non-negligently. *See Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 828 (Tex.1997) ("accident includes the negligent acts of the insured causing damage which is undesigned and unexpected."); *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.,* 416 S.W.2d 396, 400 (Tex. 1967) (finding there was an accident when the action, the deliberate fumigation of a rice mill was performed negligently, and the effect was neither the intended nor the expected result had the fumigation been performed non-negligently); *Federated Mut. Ins. Co.,* 197 F.3d at 726 (finding there was an accident when the action, the deliberate inst[a]llation of parking lot fill material was performed negligently, and the effect was neither the intended nor the expected result had the inst[a]llation been performed non-negligently). In other words, if the act is deliberately taken, performed negligently, and the effect is not the intended or expected result had the deliberate act been performed non-negligently, there is an accident.

*Harken Exploration Co.,* 261 F.3d at 472–73.

In this case, the Monarch plaintiffs alleged that the Western Rim entities "faxed, or had faxed on [their] behalf, with [their] knowledge, unsolicited advertisements to Plaintiffs and others." In paragraph 7, the Monarch plaintiffs further allege that "many of the defendant's violations of the [TCPA] were not committed negligently, but alternatively, were committed willfully and/or knowingly." With respect to damages, the Monarch plaintiffs claim that their right to privacy was violated and they were forced to incur expenses they did not request, including loss of business opportunity and valuable time and productivity. In addition, the Monarch plaintiffs alleged that the illegal faxing deprived them of the full use of their property.

Gulf argues that there is no accident alleged because: (1) the Monarch petition asserts that the unsolicited fax advertisements were sent intentionally; (2) the effects of sending unsolicited faxes was known or anticipated; and (3) Western Rim's intent to violate the TCPA is irrelevant. The Western Rim entities, on the other hand, argue that an accident is asserted because: (1) the allegations in the Monarch lawsuit do not preclude the possibility of non-intentional statutory violations and (2) the alleged violations of the TCPA were not reasonably foreseeable.

Subjecting the Monarch plaintiffs' factual allegations to the accident standards set forth by the Texas Supreme Court, the Court concludes that the allegations made

by the Monarch plaintiffs in the Monarch lawsuit do not aver an accident. Although the faxing of the unsolicited advertisements is alleged to have been performed negligently,[10] the damages that the Monarch plaintiffs alleged they incurred are the intended and expected effects even if the Western Rim entities had acted non-negligently by obtaining the permission of the Monarch plaintiffs before they faxed the advertisements. The Western Rim entities intended for their agent to fax advertisements to potential renters and this is the act that was deliberately taken and alleged to have been performed negligently in that the advertisements were not solicited. The effects of this deliberate action are that the Monarch plaintiffs temporarily lost the use of their facsimile machines, lost potential business opportunities, and expended money on paper and ink for the facsimile machines. But these effects would have occurred even if the Western Rim entities had not acted negligently by obtaining permission to fax the advertisements to the Monarch plaintiffs. Consequently, the faxing of the unsolicited advertisements was not an accident and cannot be, therefore, an occurrence under the CGL policy. Because the allegations in the Monarch petition do not aver an occurrence, Gulf does not have a duty to defend the Western Rim entities under the property-damage portion of the CGL policy.

## B. Advertising Injury

The next issue is whether the claims in the Monarch lawsuit fall within the advertising-injury coverage provided by Gulf's CGL policy. Gulf argues that there is no advertising injury because there is no assertion in the Monarch plaintiffs' petition that the facsimiles were published to a third-party as required to establish most right-of-privacy invasions; no allegation that the content of the facsimiles was offensive or invasive, which is required under the definition of "advertising injury" in Gulf's CGL policy; no assertion that the plaintiffs' damages were due to an invasion of privacy, which is required under Gulf's CGL policy, because the plaintiffs in the Monarch lawsuit do not seek actual damages and instead seek a statutory penalty in the amount of $500.00 per facsimile; and no allegation that the Western Rim entities violated any of the common-law privacy torts. In addition, Gulf argues that there is no evidence that the TCPA creates a statutory invasion-of-privacy claim and, even assuming that there was an advertising injury, coverage is barred by one of the exclusions in the CGL policy. The Western Rim entities, relying on *Prime TV, LLC v. Travelers Insurance Company*, 223 F.Supp.2d 744 (M.D.N.C. 2002),[11] insist that: (1) Gulf mistakenly assumes that the underlying claims must be premised on a traditional common-law

---

**10.** The Court notes that the Monarch plaintiffs also made an alternative allegation that the Western Rim entities faxed the advertisements intentionally and knowingly. However, because an insurer has a duty to defend the entire suit if it has a duty to defend any portion of a suit, Gulf must defend the Western Rim entities against the entire suit, including alternative causes of action that would not alone trigger the duty to defend. *See Harken Exploration Co.*, 261 F.3d at 474.

**11.** In *Prime TV, LLC v. Travelers Insurance Co.*, 223 F.Supp.2d 744 (M.D.N.C.2002), the

United States District Court for the Middle District of North Carolina held that the defendant insurance companies had a duty to defend Prime TV against numerous lawsuits filed against Prime TV under the TCPA. There, Prime TV, which marketed and sold satellite television services as an independent contractor for DirecTV, hired several fax companies to distribute advertisements for its services. Prime TV was informed by these fax companies that they would fax advertisements only to consumers who had specifically requested information regarding the services provided by Prime TV. Instead, they sent fax

privacy tort; (2) the advertising-injury provision of the CGL policy is invoked by the Monarch plaintiffs' claims that they received unsolicited fax advertisements that violated their right to privacy; and (3) Gulf does not interpret words in the CGL policy in accordance with the plain meaning normally given to these words.

 After reviewing the petition in the Monarch lawsuit and the CGL policy, the Court concludes that the Monarch plaintiffs have alleged conduct that constitutes an advertising injury as defined in the CGL policy. According to the policy, Gulf has a duty to defend the Western Rim entities if the Monarch plaintiffs have alleged in the Monarch suit that they sustained damage because of an advertising injury. Gulf's CGL policy provides coverage for " 'advertising injury' caused by an offense committed in the course of advertising [the Western Rim entities'] goods, products or services." Advertising injury is defined in the CGL policy as, among other things, "[o]ral or written publication of material that violates a person's right of privacy."

In this case, the Monarch plaintiffs allege that their rights of privacy were vio-lated when the Western Rim entities "faxed, or had faxed on [their] behalf, with [their] knowledge, unsolicited advertisements to Plaintiffs and others." (Monarch Pls.' Pet. at 4.) The first issue is whether it's alleged that there was an oral or written publication. Gulf argues that the word "publication" is a "term of art used in defamation and invasion of privacy cases" and that it means "to communicate orally, in writing, or in print to a third party." (Gulf's Mot. at 18.) Gulf claims that the "underlying petition does not allege ... that communications to third persons occurred." (*Id.*) The Court agrees that "publication" is a term of art when used in defamation causes of action, connoting that the defamatory statements must be communicated to a third party before they are actionable. *See, e.g., Abbott v. Pollock,* 946 S.W.2d 513, 519 (Tex.App.—Austin 1997, writ denied). "Publication," however, does not necessarily carry the same baggage when employed in the context of invasion-of-privacy torts.[12] An invasion-of-privacy claim based on intrusion upon seclusion, for instance, does not require that its factual underpinnings include an allegation of publication to a third party.[13] Further-

---

advertisements to millions of potential customers. As a result, Prime TV was sued in venues throughout the United States. Each of the lawsuits alleged that Prime TV violated the TCPA by sending unsolicited fax advertisements. Some of the lawsuits also contained claims for negligence, unfair trade practices, invasion of privacy, and trespass.

After the lawsuits were filed, Prime TV requested that its insurer provide it a defense under various CGL policies that Prime TV had purchased from Travelers Insurance. These CGL policies provided identical property-damage and advertising-injury coverage as is provided by the CGL policy issued here by Gulf to the Western Rim entities. Travelers also refused to defend Prime TV in the underlying actions or admit coverage.

**12.** There are presently four fact patterns that will support the tort of invasion of privacy in most jurisdictions: (1) intrusion upon seclusion; (2) public disclosure of embarrassing private facts; (3) publicity placing a person in a false light; and (4) misappropriation of one's name or likeness. *See Indus. Found. of the South v. Tex. Indus. Accident Bd.,* 540 S.W.2d 668, 682 (Tex.1976). However, Texas does not recognize the tort of publicity placing a person in a false light. *See Doe v. United States,* 83 F.Supp.2d 833, 840 (S.D.Tex.2000); *Cain v. Hearst Corp.,* 878 S.W.2d 577, 578–79 (Tex.1994).

**13.** In order to state a claim for intrusion upon seclusion, a plaintiff must allege: (1) an intentional intrusion, (2) upon the seclusion, solitude, or private affairs of another; (3) which would be highly offensive to a reasonable person. *See Farrington v. Sysco Food Servs., Inc.,* 865 S.W.2d 247, 253 (Tex.App.—Houston [1 Dist.] 1993, writ denied).

more, there is nothing in the CGL policy indicating that the word "publication" necessarily means communicating the offending material to a third-party. Consequently, the Western Rim entities' alleged acts of faxing the advertisements to the Monarch plaintiffs may constitute a written publication. For purposes of determining whether Gulf has a duty to defend, "may" would be enough.

The next issue is whether it's alleged that the publication was of material that violates a person's right of privacy. The Monarch plaintiffs allege that the receipt of the unsolicited advertisements violated their right to privacy and seek recovery for such violations under the TCPA. The Western Rim entities' unsolicited advertisements constitute the material that allegedly violates the Monarch plaintiffs' right of privacy. Although Gulf argues that the "policy does not apply because there is no allegation that the **content** of the faxes was offensive or invasive" (Gulf's Br. in Supp. of Mot. for Summ. J. ("Gulf's Br.") at 16), the Monarch plaintiffs claim that it was the unsolicited faxed advertisement itself, regardless of the specific content of the advertisement, that was the material violating their right of privacy. In other words, the Monarch plaintiffs allege that the **unwanted advertisement,** regardless of what it specifically advertises, is the **material** that is offensive and violative of their right of privacy. This notion is supported by the text of the TCPA. The stated purpose of the TCPA, as noted by the court in *Prime TV,* and the Fourth Circuit Court of Appeals in *International Science and Technology Institute, Inc. v. Inacom Communications, Inc.,* 106 F.3d 1146, 1150 (4th Cir.1997), is

to protect the privacy of individuals from receiving unsolicited faxed advertisements. *See* 47 U.S.C.A. § 227(b)(2)(B)(ii)(I) & 227(b)(2)(C).[14]

Gulf argues that there is no advertising-injury coverage because the Monarch plaintiffs are seeking a statutory penalty instead of actual damages caused by a covered advertising offense. This argument is not persuasive in view of the Court's duty to liberally construe the allegations in the petition when determining whether an insurer has a duty to defend. *See St. Paul Fire & Marine Ins. Co.,* 249 F.3d at 392. The Monarch plaintiffs are, in fact, seeking damages for an advertising injury: they say they received unsolicited facsimile advertisements that invaded their privacy in violation of the TCPA. They choose to seek, however, damages in the amount of $500 for each advertising injury instead of actual damages because this is an option provided to them under the TCPA.

Now that the Court has determined that the Western Rim entities are entitled to coverage under the "advertising injury" portion of the CGL policy, the next issue is whether Gulf is relieved of its duty to defend by one of the two potentially relevant exclusions in the CGL policy. The first exclusion states that coverage is precluded if the advertising injury arises "out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity." (Pls.' App. at 51.) This exclusion does not apply. An examination of the petition in the Monarch lawsuit reveals that nowhere does it allege that the Western Rim entities sent out advertisements that they knew to contain

---

**14.** This section states:

The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission ... may ... exempt ... such ... calls ...

as ... will not adversely affect **the privacy rights that this section is intended to protect** ....

47 U.S.C.A. § 227(b)(2) (West 2003) (emphasis added).

false information. *See, e.g., Am. Safety & Risk Servs., Inc. v. Legion Indemnity Co.,* 153 F.Supp.2d 869, 874 (E.D.La.2001). In fact, there are no allegations that any of the advertisements sent out contained anything other than truthful, albeit unwanted, information. Consequently, this exclusion does not preclude coverage.

 The second exclusion would, however, if the advertising injury "arise[s] out of the willful violation of a penal statute or ordinance committed by or with the consent of the insured." (Pls.' App. at 51.) Gulf claims that this exclusion clearly applies because "[t]he underlying petition clearly alleges that Western Rim 'willfully and knowingly' violated the TCPA." (Gulf's Br. at 21.) Even assuming that that is true, the determinative issue is whether the TCPA is a penal statute or ordinance. Gulf, in claiming that both the TCPA and the Texas statutes regulating the transmission of faxes found in TEX. BUS. & COM. CODE § 35.47 ("the Texas Fax Law") are penal statutes, states:

> The TCPA provides fines and penalties in the amount of $500 for each violation and authorizes treble damages. The Texas Fax Law specifically authorizes criminal prosecutions for a violation as each violation constitutes a Class C Misdemeanor. *See* TEX. BUS. & COMM. CODE § 35.47(f). Additionally, the Texas Fax Law is penal in nature because it too authorizes treble damages. *See Singleton v. Pennington,* 568 S.W.2d 367 (Tex.Civ.App.—Dallas 1997, rev'd on other grounds).

(Gulf's Br. at 22 (footnotes omitted).)

Black's Law Dictionary defines "penal statutes" by reference to the definitions for "penal code" and "penal laws," which state:

> Penal code. Bringing together and codification of substantive criminal laws of state or federal government . . . .

> Penal laws. Term, in general, refers to state and federal statutes that define criminal offenses and specify corresponding fines and punishment. Statutes imposing a penalty, fine, or punishment for certain offenses of a public nature or wrongs committed against the state.

> Strictly speaking, statutes giving a private action against a wrongdoer are not penal in their nature, neither the liability imposed nor the remedy given being penal. If the wrong done is to the individual, the law giving him a right of action is remedial, rather than penal, though the sum to be recovered may be called a "penalty" or may consist of double or treble damages.

BLACK'S LAW DICTIONARY 1133 (6th ed.1990) (citations omitted); *see Martin's Herend Imports Inc. v. Twin City Fire Ins. Co.,* No. CIV.A. H–99–064, 2000 WL 33795043, at *10 (S.D.Tex. Mar.31, 2000).

The TCPA states:

(b) Restrictions on use of automated telephone equipment

(1) Prohibitions

It shall be unlawful for any person within the United States—

> . . . .

> (C) to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine;

> . . . .

(3) Private right of action

A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

> (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227 (2003). Furthermore, the Texas Fax Law states:

(a) A person may not make a telephone call or use an automatic dial announcing device to make a telephone call for the purpose of making a sale . . . .

(b) A person may not make or cause to be made a transmission for the purpose of a solicitation or sale to a facsimile recording device or other telecopier for which the person or entity receiving the transmission will be charged for the transmission, unless the person or entity receiving the transmission has given, prior to the transmission, consent to make or cause to be made the transmission.

(c) A person may not make or cause to be made a transmission for the purpose of a solicitation or sale to a facsimile recording device after 11 p.m. and before 7 a.m.

. . . .

(e) A person who violates Subsection (a), (b), or (c) of this section commits an offense. An offense under this section is a Class C misdemeanor.

(f) A person who receives a communication that violates 47 U.S.C. Section 227, a regulation adopted under that provision, or this section may bring an action against the person who originates the communication in a court of this state for an injunction, damages in the amount provided by this subsection, or both. A plaintiff prevailing in an action for damages under this subsection is entitled to the greater of $500 for each violation or the person's actual damages, except that the court may increase the amount of the award to not more than the greater of $1,500 for each violation or three times the person's actual damages if the court finds that the defendant committed the violation knowingly or intentionally.

Tex. Bus. & Com. Code Ann. § 35.47 (Vernon 2002).

In light of the definition of a penal statute; the Court concludes that the Texas Fax Law is a penal statute, but that the TCPA is not. Thus, for the exclusion to apply, the petition in the Monarch suit must allege facts that would, if true, demonstrate a violation of the Texas Fax Law. Accordingly, the Monarch plaintiffs must have alleged that the Western Rim entities caused a "transmission to be made for the purpose of a solicitation or sale to a facsimile recording device or other telecopier **for which the person or entity receiving the transmission will be charged for the transmission,** unless the person or entity receiving the transmission has given, prior to the transmission, consent to make or cause to be made the transmission." (Emphasis Added.)

After reviewing the specific allegations in the petition in the Monarch lawsuit, there are no allegations, explicit or implicit, that the Monarch plaintiffs, the persons receiving the fax transmissions, would be charged for the transmissions. Consequently, the Court cannot concludes that the advertising injury arose out of the willful violation of the Texas Fax Law. Therefore, the penal exclusion does not apply and Gulf has a duty to defend the Western Rim entities in the Monarch lawsuit.

## IV. CONCLUSION

Based on the foregoing, it is ORDERED that Gulf's motion for partial summary judgment [doc. # 22–1] is DENIED.

It is further ORDERED that the Western Rim entities' motion for partial summary judgment [doc. # 25–1] is GRANTED.